**Charles Herbert WHITE, Appellant,**

v.

**UNITED STATES of America,**
Appellee.

No. 20726.

United States Court of Appeals,
Eighth Circuit.

Sept. 16, 1971.

Edward F. Fogarty, Omaha, Neb., for appellant.

Robert J. Becker, Asst. U. S. Atty., Richard A. Dier, U. S. Atty., D. Neb., Omaha, Neb., for appellee.

Before MATTHES, Chief Judge, GIBSON, Circuit Judge, and HENLEY, District Judge.*

GIBSON, Circuit Judge.

The defendant was convicted in a jury trial in the District of Nebraska, the Honorable Richard E. Robinson presiding, of possession of counterfeit bills in violation of 18 U.S.C. § 472. The sole question on appeal is the validity of the arrest, the search of defendant's rented car and the seizure of counterfeit Federal Reserve notes.

At about 1:00 p. m., June 7, 1970, a special agent in the Omaha, Nebraska, office of the Secret Service received a phone call from an informant that a man using a false name, Homer L. Bennett, was in town with a number of counterfeit $20 bills. The informant thought the man's real name might be Charles White. He gave the agent a de-

---

* Chief Judge, United States District Court, Eastern District of Arkansas, sitting by designation.

scription of the man and of the rented car he was driving, a 1970 Dodge Charger. The informant had supplied reliable information in two or three prior cases. The informant's information in this case was not based on personal knowledge, but was hearsay from an unnamed third individual, who allegedly had personally observed defendant with the counterfeit money.

The Secret Service checked with various car rental agencies in town and ascertained that a Homer Bennett had rented a car matching the description given by the informant. Upon checking various motels in town, the Secret Service found out that Homer Bennett, driving the car in question, was staying at the Prom Town House. The agents then proceeded to that motel, located the car, and observed it pulling out of the parking lot. They thereupon followed the car, but lost it in traffic. The local police were then notified to look for the car and its occupant.

Later that same day, the police received notification that a car was parked on the street with its occupant slumped over the steering wheel. Two police cars went to investigate, and upon arriving at the scene, at about 5:30 p. m. discovered that the car matched the description given to them by the Secret Service. Four policemen got out, surrounded the car and ordered the occupant, the defendant, out of the car, as he was getting out, one of the policemen reached into the back seat of the car and pulled out a small plastic bag. The policeman looked into the plastic bag and it was discovered to contain a syringe. The defendant was frisked for weapons; he had none. He was ordered to produce his driver's license, which he did and which was obviously altered, bearing the name Homer L. Bennett and a Kansas City address.

The defendant was arrested and taken to the police station on charges of possessing an altered driver's license. He was there interviewed by the Secret Service and told them his real name was Charles White. Further investigation was undertaken and it was discovered that the defendant was a known narcotics addict with a history of prior convictions. On the basis of this information, coupled with the syringe which had been found, the local police obtained a warrant to search the car for narcotics. This search took place the same evening as defendant's arrest, and while it was apparently conducted by the local police, the Secret Service agents were present. No narcotics were found, but 39 counterfeit $20 bills were discovered under the carpet on the passenger's side of the front seat of the car. This prosecution and conviction followed.

## I. THE VALIDITY OF THE INITIAL STOP

The defendant contends that when the local police initially stopped the defendant this constituted an arrest, and that at this time there was no probable cause for the arrest. He relies primarily on Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 91 S. Ct. 1031, 28 L.Ed.2d 306 (1971). The Government, on the other hand, seeks to justify the initial stop of the defendant as an "investigative stop" under the principles of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The defendant seeks to distinguish Terry mainly on the grounds that in this case the officers had not personally observed any suspicious conduct on the part of the defendant, as of the time of the initial stop. It is true that most of the cases involving an "investigative stop" under the Terry case have involved personal observation of suspicious activity by the police officer. However, we do not believe that the justification for an investigative stop under the Fourth Amendment is necessarily predicated upon personal observation. It is rather predicated upon the "specificity of information" upon which the police act. Terry v. Ohio, 392 U.S. at 21 n. 18, 88 S.Ct. 1868, 20 L.Ed.2d 889. This specificity of information can of course be obtained through personal observation. But it can also be obtained from

other sources. And one of these traditional sources has always been the informer's tip. In determining whether at the time of this stop, which was admittedly based in part on the informer's tip, the police had enough specific information to justify the intrusion, we must be guided by the standards of Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); and Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); see also United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

We first analyze the tip which was given to the Secret Service. This consisted of eight specific pieces of information: 1. A description of the suspected man; 2. The man was from out of town; 3. The man was using the name Homer Bennett; 4. That was a false name; 5. The man's real name might be Charles White; 6. The man was driving a rented car; 7. The car was a 1970 Dodge Charger; 8. The man possessed counterfeit $20 bills. It is to be noted that this is a highly specific tip, containing considerably more detail than either that disapproved in Spinelli or the one approved in Draper. This in itself tends to give reliability to the tip and to take it out of the realm of idle bar chatter. Additionally, aside from the conclusion that the man possessed counterfeit bills, the tip contained one item of information that tended to cast suspicion on the suspected man, namely that he was using a false name. Clearly the Secret Service was entitled to conduct an investigation on the basis of this information, and to question the suspect.

Pursuing the investigation, the Secret Service discovered the following facts which corroborated in part the tip that a man named Homer Bennett, giving an out of town address, had rented a 1970 Dodge Charger. They had located the car and observed a man meeting the description of the suspect getting into it. Thus, prior to the stop of the defendant they had independently verified five of the eight pieces of information given in the tip, namely items 1, 2, 3, 6, and 7. Clearly they had reason to pursue the investigation further. At this point there appeared to be only two courses that could be pursued. They could keep the man under surveillance and see if he attempted to pass any counterfeit money, or they could stop him and see if he could give a satisfactory account of himself. They attempted the former course, and lost him in traffic. At this point they requested the local police to locate him, which they did and he was stopped.

■ We must now analyze whether at the time of the stop "the facts available to the officer at the moment of the seizure * * * 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." Terry, supra, 392 U.S. at 21–22, 88 S.Ct. at 1880. The facts available were that a tip had been received which was of great enough specificity to be indicative of reliability; five of the eight pieces of information in this tip had been independently verified; surveillance of the suspect had been attempted and failed; the man was from out of town and might soon disappear. Admittedly at this point there was not probable cause to arrest the man, because the independently verified pieces of information were not of themselves incriminating. However, we think a stop at this point was clearly justified to obtain identification of the suspect. If he was able to present proper identification, the police would then know that either they had the wrong man or that the tip was unreliable in one essential aspect, namely that the man was using a false name. On the other hand, if he did not have proper identification, the tip would then be corroborated in another essential aspect. Thus "the action taken was appropriate." Of course, after the stop, the officers discovered the altered driver's license. This corroborated the information that the man was using a false name, and in addition provided a significant additional piece of information, namely, that he was using an altered driver's license, in itself a crime.

Before proceeding to analyze the validity of the ensuing search upon which the defendant's conviction rests, we here compare the validity of the procedure used in apprehending the defendant with that disapproved by the Supreme Court in Whiteley v. Warden, *supra*. We think the instant case can be distinguished from *Whiteley* in at least four aspects. First of all, it was quite clear in *Whiteley* that the defendant was stopped solely for the purpose of arresting him, and indeed that he was then and there arrested. Here, while the defendant strenuously urges that that was the same purpose of his stop, we do not think that conclusion is necessarily warranted by the record. The police had received a report that the driver was slumped over the wheel of the car. The officers testified that even had they had no other reports relative to this suspect, they would have had to stop him and check to see if he were ill or drunk, because his driving a car under those conditions would present a traffic hazard. Furthermore, they testified that they had no plans to take him into custody at that time, and that if his identification was in order they would have had to let him go. This of course is consistent with the theory that the stop was for purposes of investigation only.

Secondly, the case is distinguishable from *Whiteley* in terms of the specificity of the tip involved. It appears in *Whiteley* that the sheriff's tip involved only the conclusory allegation that the defendant there had committed the alleged crime. As discussed above, the tip in this case was considerably more detailed.

Thirdly, in *Whiteley,* the Supreme Court noted that "the record is devoid of any information at any stage of the proceeding from the time of the burglary to the event of the arrest and search that would support either the reliability of the informant or the informant's conclusion that these men were connected with the crime." 401 U.S. at 567, 91 S.Ct. at 1036. Here the informant's reliability was bolstered both by the specificity of the tip and by the independent corroboration of a substantial number of the facts it contained. It is true that at the time of the stop the conclusion that the defendant was connected with the crime had not yet been independently corroborated but that is generally the situation with most investigations, and we do not think that is determinative in a situation where the police are stopping for purposes of investigation only and not for purposes of arrest.

Finally, it may be noted that in *Whiteley* the police were dealing with a person who was apparently known to them, was a resident of the area, and was using his own identity. There was not a danger of totally losing him if he was not immediately apprehended. In the instant case, the suspect was known to be from out of town, driving a rented car, and staying at a motel; he was further suspected of using a false identity. If the investigation were not conducted quickly, he might soon disappear.

Thus we conclude that the initial stop of the defendant was valid. Of course, when he presented the officers with the altered driver's license, they then had probable cause to arrest him on that charge, which they did.

## II. THE VALIDITY OF THE SEARCH AND SEIZURE

Shortly after the defendant was taken to the police station and booked on the altered driver's license charge, he revealed to the police and the Secret Service agents that his real name was Charles White. At this point every item of information in the tip had been corroborated, including the most uncertain one as to the suspect's real name, with the exception of course of his possession of counterfeit bills. In addition, the police had uncovered another item of information which tended to cast suspicion on the defendant—that he was using an altered driver's license. This is a much stronger case factually than Draper v. United States, *supra*, and we think that clearly at this point the police had prob-

able cause to search the defendant's automobile.

It may be noted that in assessing the probable cause which existed for the search of this car, while the record clearly shows all the information discussed above, it does not make it entirely clear that each and every officer possessed every item of information which combined to create the probable cause. However, "in determining whether probable cause existed we must evaluate the collective information of all the officers." Wood v. Crouse, 436 F.2d 1077, 1078 (10th Cir. 1971); Turk v. United States, 429 F.2d 1327, 1331 (8th Cir. 1970); United States v. Trabucco, 424 F.2d 1311, 1315 (5th Cir.), cert. dismissed, 399 U.S. 918, 90 S.Ct. 2224, 26 L.Ed.2d 785 (1970); Smith v. United States, 123 U.S.App.D.C. 202, 358 F.2d 833, 835, cert. denied, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1966).

█ Nor does the fact that at the time of the search, the officers did not completely and correctly articulate their grounds for the search invalidate it, if in fact from an objective standpoint probable cause existed. "The test of probable cause is not the articulation of the policeman's subjective theory but the objective view of the facts." Dodd v. Beto, 435 F.2d 868, 870 (5th Cir. 1970); Klingler v. United States, 409 F.2d 299, 304 (8th Cir.), cert. denied 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969); Smith v. United States, 402 F.2d 771 (9th Cir. 1968); Sirimarco v. United States, 315 F.2d 699, 702 (10th Cir.), cert. denied, 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1032 (1963).

While the defendant has attacked the validity of the search warrant in this case, we do not find it necessary to pass on this question, because we believe that the search can be justified as a warrantless search based upon probable cause under the principles of Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Chambers noted that not "in every conceivable circumstance the search of an auto even with probable cause may be made without the extra protection for privacy that a warrant affords." Id. at 50, 90 S.Ct. at 1981. However, the circumstances in the instant case justified an immediate search. The defendant was being held for possessing an altered driver's license, a charge which presumably would not permit him to be detained long. Although there was probable cause to search the car, there was not yet probable cause to arrest him on the counterfeiting charge. The car was in the custody of the police. Were the defendant to be released, he and the car might quickly disappear.

"The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained. * * * [F]or the purposes of the Fourth Amendment there is a constitutional difference between houses and cars." Chambers v. Maroney, 399 U.S. at 52, 90 S.Ct. at 1981 (footnote omitted).

We conclude that the warrantless search was valid.

The judgment is affirmed.